May it please the court. Here's what Congress in 1991 knew. It knew that there was growing evidence of an association between exposure to Agent Orange and several diseases. It knew that one of those diseases was non-Hodgkin's lymphoma, and it knew that non-Hodgkin's lymphoma affected Blue Water Navy veterans more than even other Vietnam veterans. Congress didn't know why, but we didn't know why a lot of things were happening with respect to Agent Orange. Indeed, Congress knew that the CDC had tried and failed to determine which Vietnam veterans were and were not exposed to Agent Orange. And 15 years after the United States military left Vietnam, Congress needed to address the challenges that were facing Vietnam veterans who could not wait for scientific certainty that might never come. So here's what Congress in 1991 did. It enacted the Agent Orange Act, creating a presumption of exposure and service connection for all veterans who served in the Republic of Vietnam. It codified presumptions, it codified that presumption for three diseases, the first of which was non-Hodgkin's lymphoma, which Congress recognized disproportionately affected veterans in the Blue Water Navy. And all of the presumptions that it codified under VA's covered service in the territorial sea, both in the offshore waters, in fact, both on the face of the regulations and in practice. Is there a difference between offshore waters and territorial seas? There is. The offshore waters is broader than the territorial sea. It includes the additional bands of sea, such as the contiguous zone and the exclusive economic zone. And it's an important difference because a nation is sovereign only in its territorial sea. So along those lines, I mean, the numbers we are talking about here, and I was going to ask the government about this too. What I was able to do is go back to the recent CBO report on the House bill that was passed. And those numbers, they come down to 52,000 and then maybe 30,000. But as Judge Moore pointed out, those numbers are tied to service offshore. So is that number much broader or broader than what you would suggest would be the outcome here? So I'm not certain. I do believe that that number would be tied to the coverage of the bill, which goes, it's defined by geographic points, but it covers 12 nautical miles of the territorial sea. So I do understand that 52,000 estimate to be within the 12 nautical miles of the territorial sea. Is that what your definition would be of the Republic of Vietnam, the internal waters, the territorial sea, and the airspace? Yeah, but is the territorial sea defined by 12 miles? Is that what your contention is? Currently it is. It was three nautical miles. The Republic of Vietnam claimed a territorial sea of three nautical miles in 1965. And the government argues that the fact that that changed over time, by 1974, South Vietnam's position was that the territorial sea should be 12 nautical, yes, it should be 12 nautical miles. What about the French claims, all up and down the Vietnamese coast, French Indochina, of 20 kilometers offshore? So that would not be relevant to the definition of the Republic of Vietnam, since the question is of sovereignty. And what international law allows is a nation to claim sovereignty in its territorial sea. Under the 1958 convention, the length of the territorial sea was not defined. It delimited the baselines and it granted sovereignty in the territorial sea, but it didn't set a limit on that until the third convention, which took effect in 1994. But the question is, what did the sovereign claim? And what did they claim as of the passage of the Act? So as of the passage of the Act, the Republic of Vietnam was not in existence. The Socialist Republic of Vietnam, by 1991, had claimed a 12 nautical mile territorial sea, but the country that existed... They claimed it well before then. Correct. By the time of the 1991 Act, they had. But in 1965, the Republic of Vietnam claimed a three nautical mile territorial sea. They broadened that later in the 1970s. But the key fact here is, whether the size of the sea changed over time does not affect whether it is part of the sovereign Republic of Vietnam. What do you make of the fact that if you look at dictionaries and atlases, they do not define countries in terms of their offshore waters. They define it in terms of square miles of landmass. Doesn't that suggest that when you refer to a country in legislation, particularly if you're not talking about sovereign or regulatory authority, that you would be looking to a standard dictionary or atlas definition of what a country is? No, Your Honor. I think you may be referring to, for example, the CIA World Factbook, which the Veterans Court had cited in the decision underlying the Haas decision. I'm referring to dictionaries. Some dictionaries don't address the question at all. But to the extent that they do, they define the country in terms of square miles of land there, as do atlases. What do you make of that? What weight should we give to that fact in determining what the Republic of Vietnam means in a statute? We should give no weight to that because the question, when Congress uses a term that has an established meaning in a particular body of law, we assume that Congress meant it to have that meaning unless there's a contrary indication in the statute. And here, the name of a country is a term that has meaning in international law. And international law is clear that a nation includes its territorial sea. The statute of the Permanent Court of International Justice, as one factor in defining a nation state, includes a defined territory. And the Court of International Justice has discussed the impact of sea territories in, for instance, England and Norway. I'm not familiar with that particular law. No, I mean, we've cited other, we've cited United States Supreme Court decisions, as well as treaties, as well as the restatement of the law, all of which are consistent with the fact that the territorial sea is part of a sovereign territory. Sure, but when you're looking at definitions of territory, you have to look at what the international practice is in defining a state. And the court has, the International Court of Justice, has specifically defined that in resolving oil drilling conflicts off the coast of Norway and the UK. I'm not familiar with those decisions. I don't know what they've said. What I do know is that. What they said is that territorial waters are part of a nation's territory. So that would be consistent with our position that the territorial waters, i.e. the territorial sea, are part of a sovereign nation. The additional bans, the contiguous zone, the exclusive economic zone are not. Can I ask you, if we agree that unambiguously the statute incorporates territorial waters, but as I think I heard you indicate, the actual number of miles might have varied over time. Would the application of that principle possibly change for veterans who served between 62 and 75, according to what the then Republic of Vietnam claimed at different times? It might. It's not a question that we have to resolve in this case because it's undisputed, as the board found at Appendix 32, that Mr. Procopio served in the territorial sea, and at the time that is within the three nautical miles. In another case, there may be a question as to how to define it during that time period. And can I ask, I guess, another question. The provision of the statute that refers to, was it chloracne, has a one year from last date of service in the Republic limit. So would that apply according to not the end date of service of the veteran, but rather the last date that that veteran was in the territorial waters? It would apply to the last date that the veteran was serving in the Republic of Vietnam. So serving within, anywhere within the territory, the landmass, the sea. So it was in the ship for two years, and on day one of that, it was in the territorial waters, and never thereafter, the one year would have run even during service. I believe that's correct. Does your position, I mean, I know it's strengthened by it, but does your position that the statute is unambiguous, does that depend upon application of the pro-veteran canon of construction? It does not. Our position is that the statute is, the inclusion of the territorial sea is unambiguous from the text of the statute, the statutory context, and the legislative history. The pro-veterans canon, as in other cases, in Gardner and Kirkendall, if anything, it just confirms that. But if the court thought that there were remaining doubt, interpretive doubt, after considering the other sources of statutory interpretation, then it would proceed to the pro-veterans canon. And we think that. So let me ask, can I ask you about the pro-veterans canon? Absolutely. Because maybe this is unique because this is really a cost provision. I mean, this is a provision that's going to directly result in cost. It's not changing the time limit or something. There are lots of veteran statutes. When we are interpreting them, applying the pro-veteran canon, we're looking, we're making certain presumptions or assumptions about what Congress intended, that that was on the pro-veteran line. So how, you know, the current, the recent activities on Capitol Hill call out that Congress is required, at least under current budgetary rules, to have a so-called pay-for and find a way to pay for whatever it is it's legislating. How do we, or should we, or shouldn't we, include that? When we're, if we're looking to the pro-veteran canon, which makes certain assumptions about Congress, should we not consider that Congress, even if it's pro-veteran, has to find a way to pay for it? And sometimes the way to pay for it might injure or harm or come out of the pocket of other veterans, as is part of the discussion on Capitol Hill now? That should not be part of the court's inquiry when applying the pro-veterans canon. So we're supposed to be super legislators, sort of making assumptions about Congress, but what you're saying, which the argument is that those aren't realistic assumptions because Congress is operating with certain restrictions in terms of what it can and cannot do. I don't think it's an unrealistic assumption. What the pro-veterans canon requires is the Supreme Court's articulation in the Fischl case is as liberal an interpretation in favor of the veteran as a harmonious interplay of the statutory provisions will support. And so we have to act within the text that Congress wrote. The pro-veterans canon does not allow the court to go beyond the clear language of the statute. It would not allow the court, for example, to interpret this statute to apply to veterans who served in North Vietnam. That's not the Republic of Vietnam or in Cambodia, even though there was. I guess you're saying that would allow the courts to interpret statutes in ways that Congress couldn't have foreseen. Let's say, for example, I mean, it's not the case here, but let's say, for example, if we adopt your construction, it costs an extra hundred billion dollars a year in order to incorporate this new group of veterans into the service presumption. I mean, is that something that the courts really ought to be injecting themselves into and then using the liberal construction canon in that way? I mean, that's such a big ticket item that nobody could really assume that Congress could say or be deemed to have intended that outcome from the courts. I don't think that's correct, Your Honor. The court is not in a position to legislate. It is the job of Congress to determine what the costs are and how to balance those. And then Congress decides what words to use based on that decision. Congress had a lot of choices in this statute. It could have said... Right, but I guess getting back to my hypothetical, it's just a hypothetical, but what if we saw that taking your interpretation would be such a big ticket number, would cost a hundred billion dollars a year? And there's just no way Congress could have foreseen that outcome, that reading of the statute when they were enacting it. I think a couple of points, Judge Chen. For one thing, if we go back to this statute, this was an open-ended statute to begin with. Congress didn't know how much this was going to cost it. Under the law at the time, that was not as strenuous a consideration. In terms of finding new diseases that were associated with Agent Orange exposure. Absolutely. And that number has grown. And I don't have the statistics, but I can imagine that the extension of the list of diseases applicable to which the presumption applies would be an even greater cost than including the veterans. But again, we're interpreting the words of Congress. I think the question is, if you assume textual ambiguity and we're talking about the role of the veterans, Ken, is it appropriate under those circumstances for us to be essentially legislating and determining what the scope should be? So my disagreement is with the characterization that that is legislating. It's not. If we look at what the Supreme Court has most recently said about how the step one analysis applies under Chevron. In order to determine whether there's an unresolved ambiguity, the question for the court is, as the Supreme Court put it in Sass, the question for the court is whether after employing all the tools of statutory construction, the court is unable to discern Congress's meaning. And then in Epic, they elaborated on that further. And it is, at the quoting Chevron, deference is not due unless a court employing traditional tools of statutory construction is left with an unresolved ambiguity. If there's an unresolved ambiguity, then you proceed to Chevron step two. And then perhaps cost comes into play in judging whether the agency is active reasonably. But if we apply the pro-veteran canon and you say it applies at step one, there's going to be very few instances where we're left with an unresolved ambiguity. There may be. There certainly are instances where there will still be an unresolved ambiguity. An example, think of three examples. One would be where the different tools of statutory interpretation point in different directions. That's, for example, this court's Nova case from 2001, where you had unclear statutory text, legislative history supporting the government, and the pro-veterans canon going the other way. That's an unresolved ambiguity. Another example is where the pro-veterans canon isn't enough to do the work. So, for example, the court's decision in Burden versus Shinseki, where the question was judging whether common law spouses were entitled to survivor benefits. And there, the two possibilities are that the benefits go to the veteran's surviving spouse or his surviving children. Neither one of those is more or less pro-veteran. The canon doesn't resolve the ambiguity there. And the third example would be an express delegation. So, for example, in the court's decision in Veterans Justice Group, where the statute says you've got to file something in a form prescribed by the secretary, that's a clear delegation. That's not what we have here. And to the extent there is any ambiguity remaining after the court considers the plain text, context, legislative history here, the pro-veterans canon is certainly strong enough to resolve any such ambiguity in this case. At what point would you say that the pro-veterans canon would apply? Before you get to step one, step zero, at step one, or after you apply all the tools of statutory construction in your toolbox at step one, then you apply the canon before you go to step two? Yes, I think it's the last way you articulated it, Judge Reyna. It's traditional canons of interpretation, as Epic confirms, are applied at step one, if you think about it as box one. The fact that it's in box one doesn't mean that it has to go at the beginning of the analysis. And certainly the first thing in the analysis at step one is the plain text of the statute. The canon nor legislative history nor context can override the plain text. And the way that courts traditionally apply these canons is after considering the other relevant tools of statutory interpretation, but before deciding that there is an unresolved ambiguity. So that's the work the canon does. It resolves a remaining ambiguity that might exist after considering the other tools. So you apply it after the other canons of construction, including legislative history? After, you apply it along with other canons of construction, I think, whether it goes before or after legislative history might be subject to debate, but that is often the way that courts... You want to apply it before Chevron? Before step two, yes. It is at Chevron step one, and I would point out, to be clear, there is... You're not suggesting, for example, that the pro-veteran canon necessarily trumps other canons. Like suppose there's a canon that words in the same statute should be presumed to have the same meaning. Yes. If the pro-veteran canon in one case would result in them having different meaning, you're not suggesting, when we're talking about first or second, we're not prioritizing it ahead of other canons. You're saying the plain text is the plain text. It goes first. Everything else gets considered together and weighed. Is that right? That's absolutely correct. It may be, in a case where a different canon pointed strongly in another direction and the pro-veteran canon pointed in the other, that that would create an unresolved ambiguity, but that's not this case. If we stand back and say that the text of the statute is clear, then we don't get to any of these questions, do we? Well, I think if you truly looked at just the plain text, Republic of Vietnam, and said it was enough that that term has a meaning in international law, that meaning includes the territorial sea, the court certainly could stop there. If the court wanted to proceed, as you go down the line, each additional tool that you add to the box confirms the same meaning. You have the statutory context, you have the legislative history, but also the history of the legislation. And I don't mean to be clever, but we're not just talking about the committee reports and the congressional record. That's all there, but also what this statute was trying to achieve. The Congress in 1991 knew that there was extensive uncertainty about where Agent Orange was sprayed, who was exposed, to what extent, and what the effects were. And so they needed to create a presumption at a time when it could still benefit the veterans who were exposed to these herbicides. So they had to draw a line, and they drew the line to include the Republic of Vietnam, and those words have a meaning. But suppose that we were to find that the text is ambiguous. And the thing that troubles me, and I'll ask the government about this too, is that we have a very uncertain situation as to whether Blue Water Navy veterans had higher levels of these cancers than Blue Water Navy veterans, let's say, who served elsewhere or the general population. You would agree that, as the 2011 IOM study concluded, the record just doesn't tell us one way or the other whether these Blue Water Navy veterans are more susceptible to these cancers or less susceptible, correct? Correct, and that same study says the same is true as to ground troops in the Brown Water Navy as well. It's not a basis to distinguish the Blue Water Navy from other veterans. It is simply a fact applicable to all Vietnam veterans. Well, I'm not really suggesting that the absence of knowledge is a basis for distinguishing. What I'm saying, what troubles me is that there hasn't been a study in all these years to determine whether the Blue Water Navy is more susceptible or less susceptible than service members who served elsewhere. And we had, in the Gray case, the Court of Appeals for Veterans Claims suggesting a rulemaking. What's your position on that? Wouldn't a rulemaking here to make a determination of whether there's a higher risk be sensible? Not at all, because in 1991 and today, the latest IOM report on Agent Orange was released last month, November 2018, and they still can't figure out who was exposed and what the effects were. And in 1991, again, what Congress knew from the CDC-selected cancer study, it knew in 1991 that Blue Water veterans were facing disproportionately high rates of non-Hodgkin's lymphoma, and it knew that there was evidence linking non-Hodgkin's lymphoma to Agent Orange exposure, and so that's what's relevant to the interpretation. But they didn't know, as to the other cancers, whether there was a higher risk or not a higher risk, and we're still in that same position today, right? That's true, but when Congress set up the statute, it didn't distinguish between different diseases and different classes of veterans. It set a uniform presumption for all veterans who served in the Republic of Vietnam, and it took non-Hodgkin's lymphoma, which was especially affecting Blue Water Navy veterans, and it put it in that statute along with the other diseases that are linked to Agent Orange exposure. The soft tissue sarcoma, the chloracne, and the list has now gone on, as well as the list in the VA's regulations. So it's your position that to the extent that Congress gave the VA rulemaking authority, it was to add diseases to the covered provisions, not to either delete diseases or delete covered veterans? Certainly not to delete covered veterans. Just to be precise, the VA does not have the authority to delete a disease that Congress has added to the statute. If it establishes by regulation that there is a positive association with a disease, it does have authority under the statute, or did at least until 2015, to then remove that disease. So that would be the one clarification. But the VA is the entity that decided a while ago that one foot on ground was sufficient to qualify, right? The General Counsel decided that in 1997, the VA added that to its manual in 2002. But at the time that Congress was acting, the VA did not have that policy. At the time that Congress was acting in 1991, the VA's regulations, both Regulation 311 and Regulation 313... But even with Regulation 311A, it does reflect that if you're offshore or if you're located elsewhere, then only if you have feet on the ground, the landmass, do you qualify for the service presumption. It does not say that, and VA had not interpreted it that way until years after the Agent Orange Act was passed. Your reading of 311A and 313 is the same, despite the adjustments of commas and things like that? That's correct, with the exception that 311A said Republic of Vietnam and 313 says Vietnam. But 313 has other more specific language in it that covers blue water veterans? No, they both cover service in the offshore waters, and they both cover service in other locations. If the conditions of service included duty or visitation within the Republic of Vietnam, there are questions about commas. But even if that conditional phrase applies both to other locations and to service in the offshore waters, it's still service in the offshore waters. If there was duty or visitation in the Republic of Vietnam, which itself includes the territorial sea, and blue water Navy service is certainly duty in the territorial sea. 311 is what is carried through to 307, right? 311 is carried through to 307. To be clear, as the VA now concedes, both 311 and 313 were codified into the Agent Orange Act. Just to get back to the main thrust of your argument why the statute is unambiguous. It's the principle that the reference to a formal country name in a statute is a term of art. Is there any case that's ever articulated that principle? When Congress uses the formal country name in a statute, we now know that we should presume that to include the territorial waters of any nation. There is not a case saying that specifically, but what there are are cases saying that when a term has meaning in international law. So, for example, the Rosero case from the Third Circuit. Could I just get your response to the one statute about the Republic of Korea reference? Yes. For the Korean medal award statute? Correct. So, like the other statutes that the VA sided with regarding Vietnam and Mexico, that statute applies to the waters adjacent, which is broader than the territorial sea. So, the fact that Congress specified waters adjacent, specified that it wanted to go beyond the territorial sea, does not suggest that if it hadn't said that. So, when it says waters adjacent, you are saying it means waters adjacent to the territorial waters of the Republic of Korea. Waters adjacent is a term that means adjacent to the coastline. It includes the territorial sea, but it goes beyond that. Thank you. May it please the court. I'd like to start where my colleague left off, and that's a discussion of 311A versus 313. Supposing Congress passes a law which forbids the expenditure of any funds for military action within purple land, and the United States, the executive branch decides to send combat forces into the claimed 12-mile territorial waters of purple land. Is that in violation or not? It likely is because the incursion of the military would impact the sovereign boundary of purple land. We don't dispute that there are restatements of law that say that coastal nations enjoy sovereignty over their territorial seas. The question is, does that phrase in the statute fit the context of the statute? The inquiry is not simply, is the phrase that's used a term of art? The next inquiry is, and does that fit in the statutory context of the specific statute? Keeping in mind the history of the whole thing, though, in July of 1964, formal armed conflict involving the United States begins when U.S. vessels are operating off the coast of North Vietnam. Within 12 miles, we say they're only entitled to eight. And that whole Gulf of Tonkin incident involves questions of territorial waters. Right, but there's no indication whatsoever in any of the text of the statute, its legislative history, its drafting history, or the regulations that came before, that Congress was thinking at all about the scope of the Republic of Vietnam. As the court found in Haas, the most reasonable reading is that they were using the phraseology from 311A, which covered service in the Republic of Vietnam. And although it is true that you don't necessarily need evidence that Congress was thinking... I guess what I'm wondering is, just as there's no case that's ever said that the use of a formal country name in a statute is a term of art, there's no case that says the opposite of that either. And so I guess what I'm wondering is, why do we have to inject this notion of context? We have to understand the context of when Congress uses a particular formal country name in a particular statute. Why can't it just be a clean rule? If it's a formal country name, then that's it. And we now know that Congress intended a particular thing. Well, for two reasons. One, the Supreme Court in Johnson said that even where a term is in fact a term of art, you then need to go on to determine whether the context fits. And in fact, in Johnson and a number of the Supreme Court cases, the court held that even though the phrase is a term of art with centuries of established meaning, Congress didn't intend to use it because it didn't fit the context. And that's true here because this is not an issue of sovereignty or jurisdiction? Correct, Your Honor. The entire predicate of the Agent Orange Act is to help veterans who... Does sovereignty and jurisdiction define the territories or the extent of the territory of a government? It does under notions of... For example, within the territorial waters, those torts that occur within those waters, criminal actions, the jurisdiction and the sovereignty of that country that owns those territorial waters, their law is what applies to those type of incidents, correct? Correct. We don't dispute... A legislature would look at that in terms of, I'm going to legislate laws applicable to this particular country. It just seems to me, why wouldn't that legislature assume, knowing that territorial waters include sovereignty or defined by sovereignty and jurisdiction, that the act that that legislature is passing is going to also include those territorial waters? Well, because Congress... There are numerous examples that we cite in our brief where Congress does not use the name of the United States or other countries with the presumption that it includes a territorial sea. There are a number of statutes where the Congress is referring to the United States and specifically says whether it includes a territorial sea or not. But you were speaking about context. And wouldn't, in this case, the context include the fact the government concedes that 311 and 313 were both there prior to the Agent Orange Act, that one of them applies to blue water veterans and the government says the other does not. The one that applies to blue water veterans involves a disease that Congress expressly codified in the statute. Why, under those circumstances, wouldn't we assume that the context that Congress was operating under included all of those factors and that that weighs heavily in favor of the idea that they very much were using the international law definition because they were meaning to extend the presumption to everyone who was affected based on the regulations in 311 and 313? Why wouldn't we assume that's the context they were legislating under? Because that's only part of the context, right? 313 was codified. So was 311. The fact that there were separate regulations that were phrased separately and had separate grammar is not easily dismissed as trivial. But you agree that 313 at a minimum includes the blue water veterans for the non-Hodgkin's lymphoma. Yes, Your Honor. And you agree that when Congress codified the Agent Orange Act in 1991, it knew that the VA had created that presumption in 313. Yes. And I thought that I understood you to say that Congress was codifying in the Agent Orange Act both 311 and 313. That's correct, Your Honor. Okay, so wait. So Congress was codifying a conclusion that the VA had reached that non-Hodgkin's lymphoma affected blue water veterans, but you think they nonetheless didn't intend to include them in the scope of the coverage of the statute? No, Your Honor. That's not what we're saying. What we're saying is for non-Hodgkin's lymphoma, the regulation already provided coverage for service at sea. There's no indication in the text or the legislative history that Congress was attempting to incorporate either of the formulations in 313 or 311 when it passed the Agent Orange Act, which is why it's ambiguous because you can't simply focus on 313 as suggesting that the full context is that it covered Blue Water Navy because 311A did not, and that was also codified by Congress when it passed the Agent Orange Act. And as the Haas court noted, the fact that both were incorporated is what renders this ambiguous. We cannot tell because it's not a matter of did Congress understand whether – I asked you, but you said 311 did not. A, where do you get that from, the regulation from 311? And B, did the VA ever express that view before 1991? Yes, Your Honor. Well, so 311A, the language and the use of the and and the comma, as the Haas court found, showed that it was – No, I'm not sure that that overcomes the very simple fact that what comes after the comma is still a reference to in the Republic of Vietnam and therefore would cover whatever is in the Republic of Vietnam anyway. But on the second piece, it wasn't until the General Counsel, in interpreting some other regulation in 1997, said that he or she was interpreting this similar language in the way you suggest that there was a statement to that effect. Right, that was not the first time, Your Honor. The fact that the chloracne regulation was the first presumption that was established under the 1984 Dioxin Act, and then STS was later added, when the CDC study supported the presumption for non-Hodgkin's lymphoma, the VA did not add it to 311A, which would have been the natural course of things if 311A covered service at sea. But because non-Hodgkin's lymphoma was not tied to herbicide exposure, it was not promulgated under the 1984 Act. It was promulgated under the VA's 501A, which is delegated authority. And it was put into a separate statute that covers service in Vietnam, which was more broadly understood to cover service at sea. The CDC study is quite clear. It was not linking non-Hodgkin's lymphoma to exposure. It did not discount that— So what you were just relying on, do I take it, is a set of inferences that Congress might have made, not from any expression about the interpretation of 311 that one could find written down somewhere, but rather by the absence of the placement of this new regulation in a certain place? Well, certainly Congress was aware of the CDC study, the results of the CDC study, because they instituted it. But there was no expression of the interpretation of 311 as requiring brown water or ground service. That was not as clearly expressed in the 1985 Federal Register notice that established 311A. But 311A was established pursuant to the 1984 dioxin. I mean, as I read the Federal Register in 1985, not expressed at all. Right, but it was—well, I mean, it does use the language that's in the regulation. So if you read that language as— And the commentary in explaining it makes the same point, but without the comma at all. Right, Your Honor. So it's not as— Even in Haas, we said that the VA had been very inconsistent and had not really interpreted 311 that way until 1997. The general counsel opinion was the line of demarcation. That was certainly the formal interpretation of that regulation that the court looked to in Haas. But that was in our analysis. And so the VA—I mean, but the Haas court did also note that the grammar of that regulation shows that it is different and has a different coverage than 313, which again is supported by— It didn't say it had a different coverage. It said that there's an argument being made that because of the placement of commas that it was different. But it never decided that question. But it did understand that 311A was focused on exposure and that 313 was not focused on exposure and so had a broader coverage. The CDC study found that Blue Water Navy veterans had a greater incidence of non-Hodgkin's lymphoma but could not determine why that was. So why is it when the Veterans Administration made a determination with respect to non-Hodgkin's lymphoma that it would study whether there were higher rates for Blue Water Navy veterans and concluded that there were, but it didn't make a similar study with respect to these other diseases which did depend on dioxin exposure. And this has been going on for years. And I must say I find it very unconvincing for the VA to say, well, we're not going to cover Blue Water Navy veterans because we don't know whether they have higher rates of cancer. Why are you not studying the question of whether Blue Water Navy veterans do have higher rates or do not have higher rates of these other kinds of cancers? The VA is currently studying that. And there's an epidemiological study that's supposed to come out in 2019. But it has not done it before now, right? Well, there have been numerous studies in the legislative history of the Agent Orange Act. They discuss all of them. Which were dismissed by the 2011 study as inconclusive, right? Correct, Your Honor. That doesn't seem to me a very good basis for not covering Blue Water Navy veterans, that the studies are inconclusive. Wouldn't it be appropriate, as you say they're now doing, to make a determination of whether they do have higher rates of cancer? Well, they are going to make a determination based on what the results of that study are. But how do we know what the study is? How do we know what the study is? Yeah, we are the court. Well, it's not in the record here. Isn't the point of the presumption that the veterans don't have a burden of proving this because Congress created the presumption for the precise reason that it is so difficult to prove? If they were likely exposed. And that is the critical inquiry. The Agent Orange Act is predicated on the likelihood of exposure. But you can't make a determination of likely exposure. The National Academy of Sciences has concluded that you can't make such a determination. You can't make a qualitative determination. You can make a quantitative determination of pathways of possible exposure. And they found that the ground troops and brown water Navy veterans had more likelihood of exposure than the blue water Navy troops. And, of course, the predicate for a presumption is there is no necessary certainty. Well, that's not exactly what they found, though. They found that they can't say that the blue water didn't. And they can't even say that they had anything less. They did not say that the ground, that those with foot on the ground under the VA's regulation, actually had a greater incidence. It said that they couldn't say that. Correct. It said they couldn't determine actual exposure, but that the ground troops and the brown water troops had more plausible pathways of having been exposed because of spray and usage than the blue water. But the statute didn't say you have to show a plausible pathway. The statute said you're presumed. But the statute is unclear as to which veterans it covers. And so when it comes to the VA's construction of that, as they're authorized to do, they obviously have to take the science and the policy into account. Even assuming that we don't apply the pro-veteran canon at step one of Chevron, and I'm not saying that I buy that argument, but even assuming it's true, it, of course, has to have some meaning at step two, right? It's unclear, Your Honor. You would just write it off completely? No, it wouldn't be written off completely if it did not apply at either step one or step two because there are going to be circumstances where Congress's intent is unclear, and for some reason either VA has not interpreted the language or VA's interpretation is defective procedurally or substantive, and the court is left to determine what does the ambiguous language mean. So what we have in Haas is we have a situation in which the court said or we said that the statute's ambiguous, the regulation is also ambiguous, and then we look to see whether or not our deference is appropriate, and we go through and in each instance we said it's a really close call, that they weren't consistent in their application of this principle, that the general counsel opinion doesn't directly address the regulation or directly support the VA's position, and that the science and reasoning and rationale laid out was barely enough. So we've got barely enough to get to our deference. Why doesn't the pro-veteran canon of construction at least come into play at that point? It certainly could. There's no decision. I mean, Terry suggests it does not play a role in the Step 2 analysis. The problem with the court using its review powers under the APA and using the Chevron analysis to ensure that the VA has taken a pro-veteran construction is one, it's not supported by Chevron, which says that the construction simply needs to be reasonable or permissible, but two, it introduces the same problem that we have with it being applied at Step 1, which is the court's conception of what is pro-veteran could override the VA's determination based on its knowledge and its expertise of what is best for veterans. But I guess my concern with your brief is it calls for the elimination of the pro-veteran canon from the entire inquiry whenever the agency, the VA, engages in rulemaking. That's correct. And I don't know how that can be, given that the Supreme Court has already recognized it and essentially enshrined it as a statutory construction principle. So it's not something that we can just look away from and pretend it doesn't exist anymore once the VA declares it's going to do rulemaking on an ambiguous statute. But like other rules and other doctrines, there are rules and doctrines that come after Chevron deference principles have been used to determine what an ambiguous phrase means. So it's not being cast out and never used. It just has its proper place in the analytical inquiry this court needs to conduct. And at Step 2, the question is simply whether the agency's construction is reasonable. Why wouldn't it be part of all the other tools of statutory construction that are employed in Step 1? Because footnote 9 of Chevron— It's at best a suggestion. It's indicative about a hypothetical argument that the VA was not making in that case. But I would suggest that footnote 9 of Chevron is what makes the distinction between certain canons because it says there that the analysis is whether or not Congress's intent is unambiguous. And it can use canons that aid in that determination. Not all canons aid in a determination of what Congress intended. We cite the rule of lenity as an example of a default rule that exists when all other interpretive canons or tools have failed. The veteran canon is like that. It does not tell us— Why is the veterans canon more like the pro-Native American canon? Because the history of those canons could not be more different, Your Honor. The Indian canon, as expressed in Montana v. Blackfleet Tribe, is tied to the Constitution's vesting of jurisdiction in the federal government to have sovereign relations with the tribes. And the Indian canon, because of that, is often expressed as a clear statement rule. We're not going to— So Congress's recognition that these were men and women who put their lives at risk so that our country could be free, that that's not meaningful? It's not a matter of it being meaningful, Your Honor. It's just a matter of if we're trying to draw a comparison between the two, the historical underpinnings of the pro-Indian canon suggests it should be treated differently. Now, aside from that, only two circuits have held that it comes before Chevron. The Ninth Circuit has held that it doesn't, and the Supreme Court has not held otherwise. With respect to the rule of lenity, which we analogize it to, the D.C. Circuit and the Tenth Circuit have said that Chevron trumps the rule of lenity. So there is no consistent consideration in the other circuits about how Chevron interacts with these other— Now, is this true for all liberal construction canons for remedial statutes? All of those canons just have to wait until after Step 2? I don't know if it's true for all, but the Encino Motor Cars case from last term of the Supreme Court suggests that remedial legislation canons are somewhat suspect, if not invalid, certainly at helping to determine legitimately Congress's intent. In that case, it said that the FLSA exemption canon was just an FLSA variant of the remedial legislation canon. But if the only way—assuming we're at Step 2, and the only way to determine the meaning of a regulation is to give our deference to the agency, and so it depends on that kind of leniency to the agency, wouldn't in those circumstances the two canons come into direct conflict? The canon—you mean the Auer canon and the— And the pro-veteran canon. No, Your Honor, and that's because the Supreme Court has never endorsed— So the agency gets more benefit of the doubt than the veteran. In that circumstance, yes, because Auer dictates that the agency gets deference for its interpretation of its regulations. As this Court held in Sears, Chevron and its progeny have never endorsed— certainly at Chevron, but that extends to our deference. The Court has never even dealt with the conflict between the two, let alone said that the canon comes before any level of deference to the agency. Let me shift you to the question of Step 2 of Chevron. How can it be that the willful ignorance by the VA of whether there is a higher risk or not a higher risk here can be a reasonable interpretation of the statute? How can it be that the VA has not determined whether there's a higher risk or not in these circumstances? I would respectfully dispute the willful ignorance of the VA. The VA has conducted studies. The CDC has conducted studies. The VA specifically tasked the Institutes of Medicine, as it's required to do— Well, then it came out that they don't know. But, I mean, is the study that's going on now going to be more dispositive? Is there a public description of what that study is? I'm not sure there is. I would expect it's not secret, Your Honor, and certainly Blue Water veterans are participating in that study. But the point is— When was the study undertaken? What's that? When was the study— I think it's still ongoing. When was it undertaken? Oh, when was it started? Yes. I don't know, Your Honor. When was it supposed to be completed? 2019, I believe. Next year. Let me walk you back to congressional intent. You'd agree that in the 1980s and 1990s, the U.N. Convention on the Law of the Sea was a hot topic in the Congress of the United States. Yes, Your Honor. At that time, as I referred to with your opposing counsel, the Court of International Justice decided the North Sea oil case, which dealt directly with the meaning of territorial waters. You'd agree that Congress was aware of that case. I have no reason to believe they weren't, Your Honor. Then in defining a state, ipso facto Congress knew that it included territorial waters. Congress certainly can be presumed to be aware that it could, Your Honor. But the fact is that Congress— Well, the Court had held that it did, the Court of International Justice. But Congress passes statutes all the time where it takes pain to ensure that territorial seas are covered because the context is what ultimately determines the meaning of the phrases where they're not necessarily defined, even in terms of art. In defining other states? Well, there's no—I mean, there's been no case, as Judge Chen pointed out— What about statutes? When the United States refers to other states, what statutes say the Purple Land and also its territorial seas, as opposed to Purple Land? Well, the example we gave— You conceded that the United States would be in violation of a congressional statute if it operated out of Purple Land's waters. Because the context of that statute, without knowing exactly what its phraseology was, would impact foreign relations law. The context would fit in that circumstance. The Submerged Lands Act cases that Mr. Procopio relies on, again, the situation where the context fits because the statute was giving the Supreme Court the power to determine what maritime terms mean in the context of claims to seabed. But the statute here simply does not fit the context of questions of sovereign boundaries because the focus was on who was likely exposed to herbicides. Drawing a 12-mile line on that score is simply as arbitrary as drawing a 3-mile line or a 24-mile line or a 200-mile line because there's no indication, aside from customary international law, that Congress was possibly intending one specific only— Are you saying Charming Betsy? Charming Betsy is, again, not acontextual with what we're doing here. The Agent Orange Act could not possibly have infringed on the sovereign or international rights of the Republic of Vietnam at the time that the Agent Orange Act was passed. And so it also does not provide the missing intent for Congress to unambiguously have necessarily included service at sea. What's the status of the Blue Water Navy veteran bill that's in Congress? And if that ever gets enacted, how would that impact this case? Well, I don't believe that H.R. 299 amends the Agent Orange Act. It is a separate, standalone act. That's my understanding. It has passed the House. It is still in the Senate Veterans Committee and has not been passed out of that. It certainly would provide benefits to the same veterans who would have received benefits under the Agent Orange Act if it extended to service at sea. But it would not necessarily affect the interpretation of the Agent Orange Act itself, and it certainly wouldn't necessarily obviate the need to address the pro-veteran canon. Would it provide the same benefits that are at issue in this case and thereby moot it? I don't know the precise question. I believe so, but I don't know for certain. The regulations use the term waters offshore. How does that differ from territorial seas or adjacent waters? All of these different terms are a little confusing to me. Well, I think, again, context is what determines it. Well, territorial seas is actually well-defined by international law. There's no context needed there. Correct. Okay, so now adjacent waters and offshore waters. So as Mr. Procopio contends, the restatement of foreign relations defines waters adjacent to include both the 12-mile, 24-mile, and 200-mile. But then they turn around on page 17 of their reply and say that their reading of 311 must be right. Okay, but do you agree that the restatement says that? Do you agree that's the appropriate definition for adjacent waters? No, Your Honor. I think, again, context is going to determine. So what is your view or interpretation of adjacent waters then? I think if so— You don't agree with theirs, so you have to have your own. It depends on the statute. How do you say just don't agree? It depends on the statute. So the Republic of Korea covers waters adjacent. That would presumably mean that any service in the waters off the coast of the Republic of Korea would be included. Not necessarily limited to the territorial seas? Correct. So it could be broader than the territorial seas? Yes. Okay. So what about—but you in the regulations chose to go a whole different way and use offshore waters. What does that mean? Right. That can also include beyond the territorial seas. Now, Mr. Procopio contends in his reply that that actually excludes the territorial seas, but it's unclear why waters adjacent and offshore waters would have different treatment. Now, again, the offshore waters are only included under 313 as providing service connection for non-Hodgkin's and FOMA. And so your view is the regulation, at least 313, actually provides greater coverage vis-a-vis the presumption for veterans because it covers offshore waters, whereas the territorial sea definition would limit it to just the territorial seas. Correct, although my understanding is most, if not all, the 52,000 served within the territorial seas, so I'm not sure that as a practical matter there's a big distinction between who would get coverage under those two definitions. Because all those definitions are of substantial breadth, and I hadn't seen where it was pointed out that it made a difference in the result. The difference that you're arguing, I gather, is that, well, there's ambiguity. Therefore, take your judicial hands off this statute and leave it to the agency. Yes, Your Honor. That it would make a difference in the result, or that it showed that it would make a difference in the result. It could, Your Honor, because our position, as it was in Haas, is that Congress was codifying two sets of regulatory presumptions, one which covered service on land only and one that did not. And the fact that both were codified shows that it is unclear what Congress unambiguously intended when it codified both of those in the Agent Orange Act. But isn't your position also that there's no presumption of exposure on any basis? Well, there's a presumption of exposure if you served on land or on the brown water. But no presumption on the seas? Correct, Your Honor. No matter how it's defined? Correct. And that was explained by the VA in the rulemaking related to spina bifida in children of Vietnam veterans. It was explained in the rulemaking related to type 2 diabetes as being tied to where the herbicides were sprayed on land. Then tell me how that makes sense. Excuse me? It seems very curious. Since you just said it wouldn't affect the result, how does it make sense then to say, all right, we abandon the entire presumption from now on. You must provide direct proof of exposure. Because the likelihood of exposure for blue water Navy veterans was determined by the VA to be not sufficient to support the presumption. The herbicides were sprayed on land and over the land where the ground troops were. There are insufficient records to determine where the ground troops were. And so that is the basis for 311A. And the distinction between that and 313 is that 313 is not premised on exposure. It's premised on the CDC study that said explicitly, we are not basing this on exposure. You could make a determination for these other diseases, whether there was a higher level in blue water Navy veterans or not, right? There have been studies attempting to make those determinations, including the ongoing study. But it is possible to do that, no? The VA is currently trying to do that, Your Honor. Wouldn't you say that in any discussion regarding the context of jurisdiction and the sovereignty of a nation, that you would be also talking about the territorial limits of that country? If the statute had any purpose related to the sovereignty or the jurisdiction of that country. Wouldn't you start that type of discussion, though, assuming or knowing that in the context of the sovereignty or jurisdiction of a country, that you're automatically discussing the territorial limits? Now, you may take that off the table at a later time, but that's the beginning point. No, because Congress repeatedly refers to the United States and includes the territorial seas. If the baseline default presumption was that when Congress refers to a country, they mean to include the territorial seas, it would be unnecessary for them to ever specify when a statute covers the territorial seas, and yet they do so. I see I'm over my time. Thank you, Your Honor. I want to address two points in rebuttal. I want to address the confusion of the exposure issue and what Congress knew and thought in 1991, and I would like to address the pro-veterans canon as well. Quickly, to answer your question, I believe it was your question, Judge Chen, the status of H.R. 299, which was passed unanimously in the House. There are multiple holds on it in the Senate. It is not expected to pass during this Congress. To turn back to exposure, the VA did not suggest before 1997 that Regulation 311 did not cover the territorial sea. On the contrary, the base of the regulation covers service in the offshore waters, and the VA's adjudication manual passed in 1991 to implement the Agent Orange Act, which required service in the Republic of Vietnam, went even broader. They presumed service in the Republic of Vietnam if you received the Vietnam Service Medal, which was awarded to veterans on land in the territorial waters and actually in the contiguous waters and beyond as well, and they even went out of their way in the adjudication manual if you had not received the Vietnam Service Medal, that the book contended that you served in the territorial sea, that VA was obligated to go out and find records and see if the veterans' ship had been in the waters offshore Vietnam for a significant time. Even if there were a difference, to your question, Judge Moore, even if 311 didn't cover the territorial sea and 313 did. That's not true. But if it were true, that doesn't get you ambiguity. That gets you Congress codifying both, and it didn't set in the statute a different scope, a different classification for veterans. That would be confusing because for non-Hodgkin's lymphoma veterans, blue-water veterans would be included, but for soft-tissue sarcoma and colorectomy, the blue-water veterans wouldn't be included. If you were truly to codify just those two regulations. That would be confusing. And so that can't be what Congress intended. And, in fact, what Congress— And 313 was really not based on an association of exposure to Agent Orange. It was based on the statistically significant higher level of non-Hodgkin's lymphoma for all Vietnam War veterans, regardless of where they served. And that's why 313 says Vietnam, not Republic of Vietnam. But that was the VA's position. Congress, however, understood that there was a link between herbicide exposure and non-Hodgkin's lymphoma at the time. This was in the Zumwalt report, which was presented to Congress. So the CDC study did not preclude an association. It simply didn't investigate whether the NHL rates were linked to herbicide exposure. Other studies did show such a link. Congress was aware of those studies, and Representatives Smith and Hammersmith, among others, referenced the link between Agent Orange and non-Hodgkin's lymphoma. And the VA, two years later, in the IOM's— excuse me, at the time, the NAS's first report to the VA, which was required by the Agent Orange Act, it found an association between herbicide exposure and non-Hodgkin's lymphoma, and the VA secretary in the 1993 regulations accepted that. And I want to talk about, if I may, this notion of a study that's being conducted now. It is 2018. Mr. Procopio was in the Waters offshore— Do you happen to know when the study was undertaken? This is the first I've ever heard of this study, so I do not— It's been out there because in Congress they've used that as a part of saying why Congress should not act now. So it has been out there, but you don't know. I don't personally know, but what I know is that we're more than 50 years after my client was in the territorial sea of the Republic of Vietnam. This problem was supposed to be solved, and Congress thought it had solved it. In 1991, we knew that we weren't going to be able to figure out who was exposed, who wasn't, and the IOM report from 2011—this is at page 43 to 44 of our brief— is quoted that even at that point, it was impossible to quantify agent orange exposures for blue water and brown water Navy sailors, and so far, for ground troops as well. It applies to all of them equally. Finally, if I may, I want to briefly address the ProVeterans— Just to alert you, your time has expired, so if you want to make one quick comment. Certainly. I just want to direct the Court's attention to the Supreme Court's statement in Henderson that Congress's solicitude for veterans is of longstanding. There is no basis to exclude the ProVeterans canon from the role that every other canon of interpretation enjoys at Chevron Step 1. Thank you. We thank both sides. The case is submitted. That concludes our proceeding for this morning. All rise.